UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

EMILY S.,[1]

    Plaintiff,

v.

KILOLO KIJAKAZI,

    Defendant.

Case No. 22-cv-01331-RMI

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 18, 19

### INTRODUCTION

Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision denying her application for disability insurance benefits under Title II of the Social Security Act. *See* Admin. Rec. at 1372-1387.[2] In October of 2018, Plaintiff filed an application for Title II benefits alleging an onset date of January 3, 2018.[3] *Id.* at 207. Plaintiff's application was denied, as was her request for reconsideration. *Id.* at 120, 123. An administrative hearing was held before an ALJ on November 14, 2019. *Id.* at 36-81. On November 27, 2019, the ALJ entered an unfavorable decision, finding Plaintiff not disabled. *Id.* at 16-27. In June of 2020, the Appeals Council denied Plaintiff's request for review. *Id.* at 1-3. Plaintiff sought judicial review of the decision in June of 2020 (*see id.* at 1442-43), and in June of 2021 the parties stipulated to a voluntary remand of the

---

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

[2] The Administrative Record ("AR"), which is independently paginated, has been filed in fifty-four attachments to Docket Entry #15. *See* (dkts. 15-1 through 15-54).

[3] At the administrative hearing on November 14, 2019, the claimant—through her representative—amended her alleged onset date to September 19, 2018. AR at 41.

case to the Commissioner for further proceedings. *See id.* at 1446-47.

After a hearing in November of 2021 (*see id.* at 1398-1437), an ALJ issued a second unfavorable decision on December 6, 2021, finding Plaintiff not disabled. *Id.* at 1372-87. A few months later, in March of 2022, Plaintiff sought review in this court (*see* Compl. (dkt. 1) at 1-2) and the instant case was initiated. Because Plaintiff did not file written exceptions within thirty days of the ALJ's decision nor did the Appeals Council otherwise assume jurisdiction within sixty days without written exceptions being filed (*see* 20 C.F.R § 404.984(a)), the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 24 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 3 & 10), and both parties have moved for summary judgment (dkts. 18 & 19). For the reasons stated below, Plaintiff's motion is **GRANTED**, and Defendant's motion is **DENIED**.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is based on legal error. *Flaten v. Sec'y of Health and Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase "substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consol. Edison Co. v. NRLB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

**SUMMARY OF THE RELEVANT EVIDENCE**

Plaintiff raises three claims, the first two of which assign error to the ALJ's evaluation of Plaintiff's testimony and the testimony of two third-party witnesses. *See* Pl.'s Mot. (dkt. 18) at 5, 14-22.[4] Accordingly, the following is a summary of the evidence relevant to those claims.

**Plaintiff's Testimony**

*2019 Hearing*

At the administrative hearing held in November of 2019, Plaintiff testified to the following: she can prepare food for herself (AR at 53); she drives roughly twice per month and, on a two-day, ten-hour road trip she found it was more comfortable to drive than to be a passenger (*id.*); she goes to the store once a week (*id.*); she can perform self-care, but does so much less frequently (e.g., washes about once per week) (*id.* at 55); she watches television (*id.* at 55-56); she cannot focus enough to read, despite her love for it (*id.* at 56); she listens to music when she does not have a headache (*id.*); housework is challenging, with sometimes more than a week passing between doing things such as washing dishes (*id.*); she takes care of an elderly dog, which she walks around the block and occasionally slightly further (*id.* at 56-57); she took a six-day trip to California (*id.* at 57); she took a four-day trip to Florida, but it was a "horrible . . . terrible decision" as she spent half of the trip in the condominium and needed assistance from TSA after her "body just completely stopped working" (*id.* at 57-58, 68); she talks on the phone on days that she feels well (*id.* at 58); she walks to nearby restaurants and/or a movie theater with her husband once a week (*id.*); she takes wellness classes at the rape crisis center (*id.* at 59); she takes the bus roughly two times per week, unless she is having a bad week (*id.*); she socializes once every couple of weeks (*id.*); she had a foster child for four months in 2018, but the child attempted suicide and Plaintiff is no longer a licensed foster parent (*id.* at 62); she has migraines approximately six to eight times per month (*id.* at 66); she has found Zoloft helpful for her anxiety, although not so much for her depression (*id.* at 63); her daily pain level is at an eight on a ten-point scale (*id.* at 69); her pain and fatigue require her to lie down frequently, sometimes for

---

[4] Plaintiff's third claim asserts that the ALJ improperly evaluated the relevant medical opinions. Pl.'s Mot. (dkt. 18) at 5, 22-29. The evidence with respect to this claim is discussed in more detail *infra*.

1    an entire day, and she structures her day so that she can spend at least two hours of it in bed (*id.* at
2    69-70); and, when she is "stable" she does not spend all day crying or get into arguments (*id.* at
3    70-71).

### *2021 Hearing*

5    At the hearing in November of 2021, Plaintiff testified that: "intense pain" and "intense
6    anxiety and depression" prevented her from working full-time (*id.* at 1410); she attempted to work
7    as an online tutor for three to four hours per week, but this was "extraordinarily challenging" as
8    she had to cancel a session at least once a week (*id.*); she attempted working as a dog sitter, but the
9    physical exertion was "too much" (*id.*); she would have issues lifting anything repetitively other
10   than a piece of paper and a pencil (*id.* at 1411); she can only sit for fifteen minutes before needing
11   to change positions (*id.*); at least twice a week her pain is such that she cannot walk just over a
12   block to the grocery store (*id.* at 1412); she had to put down her elderly dog because she could not
13   care for it anymore (*id.* at 1413); being in public situations is "extraordinarily hard" (*id.* at 1414);
14   grocery shopping is "very hard" because it takes her a long time to read labels, the smells are
15   overwhelming, and it is "extremely challenging" when people talk to her in the store (*id.*); she
16   orders out at least three days a week because she is unable to cook (*id.* at 1415); her migraines are
17   triggered by stress, smells, food, temperature, and light (particularly indoor, fluorescent lighting)
18   (*id.* at 1415-16); her migraines last for several days, during which she cancels everything and stays
19   in bed (*id.* at 1417); she began "gentle yoga classes," but stopped after three weeks due to pain (*id.*
20   at 1417-18); her post-traumatic stress disorder ("PTSD") is triggered by authority, and she often
21   "lash[es] out" at people (*id.* at 1419); she has "keyed" cars simply for blocking the crosswalk (*id.*);
22   her depression often makes it hard for her to get out of bed, and she cries "at the drop of a hat"
23   (*id.*); she fidgets constantly, which makes others uncomfortable (*id.*); she is "easily startled" and
24   frequently screams out loud in her apartment building (*id.* at 1420); she has difficulty interacting
25   with men: she will cross the street when men are coming, has refused to be seen by a male doctor,
26   and specifically sought out a female divorce attorney (who allegedly quit because of how Plaintiff
27   treated her) (*id.* at 1420-21); she tried to complete a "yoga teacher training," but was
28   "extraordinarily anger[ed]" by the suggestion that they had to practice yoga three days per week

4

1  and refused to attend check-ins with the teachers (*id.* at 1421).

**Third-Party Testimony**

Rebecca Stewart, Plaintiff's sister, submitted a third-party statement to the following: Plaintiff is volatile, reactionary, and often yells and/or cries in hard conversations or when difficult topics arise (*id.* at 1690-91); she makes small issues into large crises (*id.*); she does not have control over her emotions (*id.*); the combination of her physical and mental issues make it difficult for her to do things consistently (*id.*); she lets dishes pile up and frequently cancels plans because she is too tired, in too much pain, or lacks the energy (*id.*); she could not accomplish tasks requested by her divorce attorneys without help from family members (*id.*).

Linda McSweeney, a teaching assistant in a graduate course that Plaintiff briefly attended, also submitted a third-party statement which, among other things, included several emails between herself and Plaintiff regarding Plaintiff's inability to participate in class (*id.* at 846-50).

**THE FIVE-STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that she has the "inability to do any substantial gainful activity by reason of any medically determinable impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R §§ 416.920(a)(4)(ii), 416.909. The ALJ must consider all evidence in the claimant's case record to determine disability (*see id.* at § 416.920(a)(3)) and must use a five-step sequential evaluation process to determine whether the claimant is disabled. *Id.* at § 416.920; *see also id.* at § 404.1520. While the claimant bears the burden of proof at steps one through four (*see Ford v. Saul*, 950 F.3d 1141, 1148 (9th Cir. 2020)), "the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). Here, the ALJ appropriately set forth the applicable law regarding the required five-step sequential evaluation process. AR at 1373-74.

At step one, the ALJ must determine if the claimant is presently engaged in "substantial gainful activity" (20 C.F.R § 404.1520(a)(4)(i)), which is defined as work done for pay or profit and involving significant mental or physical activities. *See Ford*, 950 F.3d at 1148. Here, the ALJ determined that Plaintiff had not performed substantial gainful activity during the relevant period.

AR at 1374-75.

At step two, the ALJ decides whether the claimant's impairment (or combination of impairments) is "severe" (*see* 20 C.F.R. § 404.1520(a)(4)(ii)), "meaning that it significantly limits the claimant's 'physical or mental ability to do basic work activities.'" *Ford*, 950 F.3d at 1148 (quoting 20 C.F.R. § 404.1522(a)). If no severe impairment is found, the claimant will not be found to be disabled. 20 C.F.R. § 404.1520(c). Here, the ALJ determined that Plaintiff had the following severe impairments: fibromyalgia, degenerative disc disease, migraine headaches, anxiety, depression, and PTSD. AR at 1375. The ALJ found the following conditions to be non-severe: left wrist fracture, endometriosis, obstructive sleep apnea, asthma, temporomandibular joint disorder ("TMJ"), and gastroesophageal reflux disease ("GERD"). *Id.*

At step three, the ALJ is tasked with evaluating whether the claimant has an impairment or combination of impairments that meet or equal an impairment in the "Listing of Impairments." *See* 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404 Subpt. P, App. 1. The listings describe impairments that are considered sufficiently severe so as to prevent any individual so afflicted from performing any gainful activity. *Id.* at § 404.1525(a). Each impairment is described in terms of "the objective medical and other findings needed to satisfy the criteria in that listing." *Id.* at § 404.1525(c)(3). In order for a claimant to show that his or her impairment matches a listing, it must meet all of the specified medical criteria—an impairment that manifests only some of those criteria, no matter how severely, does not "meet" that listing. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). If an impairment either meets the listed criteria, or if one or more impairments are determined to be medically equivalent to the severity of that set of criteria, that person is conclusively presumed to be disabled without a consideration of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Here, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or equals the criteria or the severity of any of the listings. AR at 1376-78.

If a claimant does not meet or equal a listing, the ALJ must formulate the claimant's residual functional capacity ("RFC"), which is defined as the most that a person can still do despite the limitations associated with their impairment. *See* 20 C.F.R. § 404.1545(a)(1). Here, the

ALJ determined that Plaintiff retained the ability to perform work at the light exertional level, subject to limitations with respect to hazard exposure (unprotected heights; mechanical vibrations; proximity to moving mechanical parts) and environmental conditions (occasional exposure to humidity and extreme cold), with an additional limitation allowing for no more than frequent interactions with people in the workplace, supervisors, coworkers, and the public. AR at 1378.

Following the formulation of the RFC, the ALJ must determine—at step four—whether the claimant is able to perform her past relevant work, which is defined as "work that [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." *See* 20 C.F.R. § 404.1560(b)(1). If the ALJ determines, based on the RFC, that the claimant can perform her past relevant work, the claimant will not be found disabled. *Id.* at § 404.1520(f). Otherwise, at step five, the burden shifts to the agency to prove that the claimant can perform a significant number of jobs that are available in the national economy. *See Ford*, 950 F.3d at 1149. To meet this burden, the ALJ may rely on the Medical-Vocational Guidelines (commonly referred to as "the grids") (20 C.F.R. Pt. 404 Subpt. P, App. 2); or, alternatively, the ALJ may rely on the testimony of a vocational expert ("VE"). *Ford*, 950 F.3d at 1149 (citation omitted). A VE may offer expert opinion testimony in response to hypothetical questions about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy, or the demands of other jobs that may be available in the national economy. *See* 20 C.F.R. § 404.1560(b)(1). An ALJ may also use other resources for this purpose, such as the Dictionary of Occupational Titles ("DOT"). *Id.*

At step four, the ALJ determined—based on the VE's testimony—that Plaintiff could not perform her past relevant work as a teacher, library media specialist, administrative clerk, small business owner, or waitress. AR at 1385. At step five, again based on the VE's testimony, the ALJ determined that Plaintiff can perform the requirements of a line attendant, product sorter, or conveyer tender. *Id.* at 1385-86. Accordingly, the ALJ determined that Plaintiff had not been disabled at any time during the relevant period. *Id.* at 1386-87.

## DISCUSSION

The ALJ in the present case erred in the formulation of Plaintiff's RFC—and beyond. The essence of this error is twofold: first, the ALJ failed to properly assess Plaintiff's pain and symptom testimony as well as the relevant medical testimony; second, the ALJ failed to correctly evaluate the testimony of Plaintiff's third-party witnesses. These errors are discussed in turn.

**Plaintiff's Pain and Symptom Testimony**

When a claimant has medically documented impairments that "might reasonably produce the symptoms or pain alleged and there is no evidence of malingering, the ALJ must give 'specific, clear, and convincing reasons for rejecting' the testimony by identifying 'which testimony [the ALJ] found not credible' and explaining 'which evidence contradicted that testimony.'" *Laborin v. Berryhill*, 867 F.3d 1151, 1155 (9th Cir. 2017) (quoting *Brown-Hunter v. Colvin*, 806 F.3d 487, 489, 494 (9th Cir. 2015)). "This is not an easy requirement to meet: 'the clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). As a matter of law, it is improper "for an ALJ to discredit excess pain testimony solely on the ground that it is not fully corroborated by objective medical findings." *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986).[5]

Here, the ALJ found that Plaintiff's impairments could reasonably be expected to cause her alleged symptoms, and there was no evidence of malingering. AR at 1378-79. The ALJ found, however, that Plaintiff's statements regarding "the intensity, persistence, and limiting effects of these symptoms" were not "entirely consistent with the medical evidence and other evidence in the record . . . ." *Id.* at 1379. The court finds that the rejection of Plaintiff's testimony was erroneous in that the explanations provided by the ALJ were neither clear nor convincing—while also often lacking the required level of specificity.

Perhaps the most glaring deficiency in the ALJ's reasoning is his misunderstanding—or misconstruing—of the symptoms associated with Plaintiff's mental health conditions. Mental

---

[5] Although "lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in [their] credibility analysis." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).

1    health conditions are often characterized by the cyclical nature of their symptoms. As such, any
2    improvement or changes in a claimant's symptoms must be considered in the context of the entire
3    record. *See Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) ("[T]reatment records must be
4    viewed in light of the overall diagnostic record."). In fact, the Ninth Circuit has "emphasized while
5    discussing mental health issues, [that] it is error to reject a claimant's testimony merely because
6    symptoms wax and wane in the course of treatment." *Garrison*, 759 F.3d at 1017. Because "cycles
7    of improvement and debilitating symptoms are a common occurrence . . . it is error for an ALJ to
8    pick out a few isolated instances of improvement . . . and to treat them as a basis for concluding
9    that a claimant is capable of working." *Id.*
10         The ALJ in the present case made such an error by singling out brief periods of
11   improvement as the basis for discrediting Plaintiff's mental health testimony. The ALJ cited
12   Plaintiff's reports that, at various times, certain medications helped her symptoms, as well as "her
13   reported improvement with treatment and intact cognitive functioning." AR at 1381. The ALJ's
14   reliance on such reports, however, ignores a plethora of evidence documenting Plaintiff's
15   continued struggle with multiple mental health conditions and their associated symptoms. *See*
16   *supra* pgs. 3-5; *see also* AR at 362-63, 365, 364-67, 379, 381, 452-53, 450, 570, 572, 715, 780,
17   782, 1725, 1761, 1814, 1830, 1856, 1877, 1885, 1939-40, 2004-05, 2012-13, 2053, 2082, 2101,
18   2112, 2125, 2155-56, 2189, 2201, 2521, 2605, 2943, 3049, 3115. To rely on a few fleeting periods
19   of improvement as the basis for discrediting Plaintiff's testify was erroneous, as such periods were
20   far outweighed by those which indicated that Plaintiff was struggling immensely. *See Lester v.*
21   *Chater*, 81 F.3d 821, 833 (9th Cir. 1995) ("Occasional symptom-free periods—and even the
22   sporadic ability to work—are not inconsistent with disability"). Further, the mere fact that Plaintiff
23   showed signs of improvement after receiving medication and undergoing treatment does not
24   necessarily indicate that she could maintain competitive employment. *See Garrison*, 759 F.3d at
25   1017 ("[I]mproved functioning while being treated and while limiting environmental stressors
26   does not always mean that a claimant can function effectively in a workplace."). As the Ninth
27   Circuit has instructed: "While ALJ's obviously must rely on examples to show that they do not
28   believe that a claimant is credible, the data points they choose must *in fact* constitute examples of

9

a broader development to satisfy the . . . 'clear and convincing' standard." *Id.* Such reasoning applies equally well to the present case. On remand, if the ALJ seeks to discredit Plaintiff's mental health testimony—which, the court wishes to stress, is a tall order—they must do so in accordance with the authorities set forth above.

*In addition* to the improper assessment of Plaintiff's mental health testimony, much of the rationale behind the rejection of Plaintiff's remaining testimony also falls short of the required standard. Among other activities, the ALJ rejected Plaintiff's testimony based on her ability to:

> [P]erform personal care, read, write, do paperwork, reheat food, prepare frozen food, do laundry, clean snow off the car, organize, clean, go out alone, drive, shop in stores and online, pay bills, count change, handle a savings account, use a checkbook or money order, watch television, do yoga, tutor, travel, go away for the weekend with friends, and care for a foster child.

AR at 1381. It has routinely been recognized, however, that "[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (quoting *Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011)). Many activities that a claimant may engage in "are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

The ALJ's explanation fails to satisfy the clear and convincing standard because many, if not most, of these activities are not necessarily inconsistent with disability. After all, a claimant "does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (quoting *Fair*, 885 F.2d at 603). If the mere reference to a claimant's ability to engage in many of the above-mentioned activities were sufficient to reject their testimony, it would be alarmingly difficult to find *any* claimant disabled. *See Kimberlee A. F. v. Kijakazi*, No. 21-CV-02290-RMI, 2022 WL 4349036, at *9 (N.D. Cal. Sept. 19, 2022) ("The ALJ's adverse credibility determination appears to assume that only a perfectly catatonic person (one who cannot read, count coins . . . or watch television) might be eligible for disability assistance."). The ability to do things like read, write, watch television, prepare frozen food, go out alone, and online shop cannot—without more—be the touchstone of the disability determination.

10

1    The mere reference to these activities is not enough, the ALJ is required to *explain* in greater detail
2    how Plaintiff's ability to engage in these activities is incompatible with disability.

3          The ALJ's characterizations of many of these activities, moreover, are also abbreviated to
4    the point of being misleading. While citing Plaintiff's ability to "do yoga," the ALJ did not clarify
5    that this consisted of only three weeks of "gentle yoga classes" before pain prevented her from
6    continuing. AR at 1417-18.[6] Plaintiff's ability to "travel," moreover, consisted of approximately
7    two to three short trips over a span of three years, one of which was characterized by Plaintiff as a
8    "horrible . . . terrible decision." *Id.* at 57-58, 68. In any case, "[a] generalized statement that travel
9    is inconsistent with a claimant's alleged limitations is insufficient without indication of what other
10   activities the claimant undertook or how much . . . w[as] required during their travel." *K.G. v.*
11   *Kijakazi*, No. 21-CV-02953-NC, 2022 WL 2207102, at *5 (N.D. Cal. June 21, 2022).[7] Finally, the
12   ALJ relied on Plaintiff's ability to "care for a foster child." Plaintiff's care, however, ended after
13   four months because of the foster child's attempted suicide. *Id.* at 62. While acknowledging the
14   seriousness of the situation, it is unclear to the court how such a tragic sequence of events could be
15   used as a basis for *discrediting* the Plaintiff. As discussed, if the ALJ still seeks to reject Plaintiff's
16   testimony on remand, they must endeavor to provide explanations that are clear and convincing.
17   *See Laborin*, 867 F.3d at 1155. The ALJ's current reasoning falls well short of this requirement.

18         Finally, in addition to the failure to provide clear and convincing reasons for rejecting the
19   testimony of Plaintiff, the ALJ also frequently failed to identify with specificity "'which testimony
20   [the ALJ] found not credible' and explain[ ] 'which evidence contradicted that testimony.'"
21   *Laborin*, 867 F.3d at 1155 (quoting *Brown-Hunter*, 806 F.3d at 494). For example, the ALJ noted
22   that Plaintiff "testified that she experiences migraines triggered by stress, scents, certain foods,
23   weather, temperature swings, rain, and light exposure." AR at 1379. The RFC, however, only

---

[6] In any case, it is worth noting that certain "activities. . . are not necessarily transferable to the work setting with regard to the impact of pain. A patient may do these activities despite pain for therapeutic reasons, but that does not mean she could concentrate on work despite the pain . . . ." *Vertigan*, 260 F.3d at 1050.

[7] *See also Ciletti v. Berryhill*, No. 17-CV-05646-EMC, 2018 WL 2761873, at *5 (N.D. Cal. June 8, 2018) ("[T]he ALJ relied on the fact that [Plaintiff] went on a Disney cruise . . . to discredit his testimony . . . That judgment was legally erroneous because . . . the ALJ should have considered whether participation in a cruise was incompatible with [Plaintiff's] claimed limitations.").

included a limitation with respect to Plaintiff's ability to work in humidity and extreme cold. *Id.* at 1378. By including only this limitation, the ALJ apparently *credited* Plaintiff's testimony as to the effect that weather and temperature have on her migraines, but *discredited* Plaintiff's testimony with respect to her other migraine triggers—yet offered little explanation as to why. The only possible explanation provided by the ALJ was that "[t]he claimant's improvement with Botox shows her condition is less limited than alleged." *Id.* at 1380.[8] Such a broad explanation, however, does nothing to address why the ALJ credited certain aspects of Plaintiff's testimony, but not others. It is unclear how Plaintiff's apparent improvement with Botox would support her testimony that weather and temperature trigger migraines, but at the same time contradict her testimony as to triggers such as light or scents. This is particularly troubling given Plaintiff's detailed testimony regarding light exposure (particularly fluorescent lighting) and scents, as well as the numerous examples of how that impacts her daily life. *Id.* at 1415-16. The court should not be required to piece together, through the limitations included in the RFC, which aspects of Plaintiff's testimony the ALJ found credible and which he did not. Both the ALJ's crediting and discrediting of Plaintiff's testimony must be explained with specificity, it is not enough to simply include (or not include) certain limitations in the RFC without further explanation.

**Medical Opinions**

A distinct—but related—issue is the ALJ's analysis of the relevant medical opinions. Pl.'s Mot. (dkt. 18) at 22-29. As set forth in detail below, the ALJ erred in the evaluation of the medical opinions pertaining to Plaintiff's mental health. The court also wishes to clarify that, in any ensuing opinion, the ALJ must assess *every* medical opinion in strict compliance with the requirements of 20 C.F.R. § 404.1520c—as set forth below.

Under recently promulgated regulations that apply to Plaintiff's application,[9] ALJs are

---

[8] In addition to being insufficiently broad, the ALJ's reasoning in this regard is questionable at best. While moderate improvements with Botox were seen, the record suggests that Plaintiff could miss anywhere from three to five days of work per month due to migraines. AR at 1380. In fact, Plaintiff testified that she would experience as many as eight such days per month. *Id.* at 1417. For reference, the VE testified that consistently missing eight or more hours of work per month (approximately one to two days per month) would preclude competitive employment. *Id.* at 1428.

[9] The new regulations apply to "claims filed on or after March 27, 2017." 20 C.F.R § 404.1520c. Because Plaintiff's application was filed in 2018, the new regulations are controlling. AR at 207.

required to evaluate the "persuasiveness" of all medical opinions according to several factors. *See* 20 C.F.R § 404.1520c(a). The first two factors—supportability and consistency—are considered the most important, and the ALJ is required to explicitly address them in his or her decision. *See id.* at § 404.1520c(b)(2); *see also Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022) ("The agency must . . . explain how [it] considered the supportability and consistency factors in reaching these findings."). The ALJ "may, but [is] not required to," explain how he or she considered the remaining factors listed in the regulations. 20 C.F.R. § 404.1520c(b)(2).[10]

These new regulations have supplanted the evaluation scheme that existed under 20 C.F.R. § 404.1527, which included a hierarchy among medical sources, deference to certain medical opinions, and the assignment of weight to all medical opinions. Ninth Circuit caselaw, since overturned, interpreted these former regulations to require "that ALJs provide 'specific and legitimate reasons' for rejecting a treating or examining doctor's opinion . . . ." *Woods*, 32 F.4th at 792. Even under the new regulations, however, an ALJ still "cannot reject an . . . opinion as unsupported or inconsistent without providing an explanation supported by *substantial evidence*." *Id.* (emphasis added); *see also* 42 U.S.C. § 404.405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").

For purposes of providing guidance on remand, the court wishes to identify several (but perhaps not all) of the errors which the ALJ committed in evaluating the relevant medical opinions. For example, the ALJ found the opinion of Abby Middleton, LCSW to be unpersuasive, as it was "not supported by her report that states the claimant gained increased ability to identify and mitigate stressors that may aggravate disabling symptoms." AR at 1383. The record, however, simply does not support the ALJ's characterization of Ms. Middleton's observations. While it is true that Ms. Middleton stated that Plaintiff's ability to "identify and mitigate stressors" had improved, she certainly did not indicate that Plaintiff would be capable of functioning in a work

---

[10] The remaining, typically discretionary factors include the medical source's relationship with the claimant (comprised of the length, frequency, purpose, and extent of the relationship), relevant specialization(s) of the medical source, as well as the source's familiarity with, or understanding of, the disability program's policies and evidentiary requirements. *See* 20 C.F.R. § 404.1520c(c)(3)-(5).

13

environment. In fact, Ms. Middleton acknowledged that this improvement "does not completely alleviate symptoms and does not cure Ms. Stewart's diagnoses," while explicitly finding that Plaintiff had extreme limitations in most work-related activities. *Id.* at 1323, 1325-28.

In rejecting Ms. Middleton's opinion, the ALJ also relied on the "generally normal findings apart from mood and affect disturbances," providing a litany of citations from the record which purportedly support this proposition. *Id.* at 1383. The findings to which the ALJ, cites, however, do not seem "generally normal"—unless consistent diagnoses of major depressive disorder, generalized anxiety disorder, and/or PTSD are considered "generally normal." Further, it is unclear to the undersigned how Plaintiff's "mood and affect disturbances" can be differentiated from her underlying diagnoses. Depression and anxiety are certainly conditions that affect an individual's mood and affect. As such, Plaintiff's "anxious" or "sad" mood and "weepy," "expansive," or "limited" affect seem part and parcel with her underlying conditions. *See, e.g.*, *id.* at 362, 365, 860. Thus, it is not altogether clear how Plaintiff could have both "mood and affect disturbances" and "generally normal findings."

Next, the ALJ found the opinion of Dr. Thurston unpersuasive, relying on Plaintiff's own report "that she is able to deal with stress and changes in routine," as well as Ms. Middleton's statement that Plaintiff "is able to mitigate and deal with stressors." *Id.* at 1384. As for Plaintiff's ability to "deal with stress and changes in routine," the ALJ cites to a single instance in which Plaintiff responded "ok" to the following questions on a patient intake form: "How well do you handle stress?"; "How well do you handle changes in routine?" *Id.* at 258. To rely on such mundane and undetailed responses as the sole basis for finding that Plaintiff can deal with stress and changes in her routine seriously overstates the record. It is also worth noting that the ALJ apparently credited Plaintiff's testimony in this regard (in other words, where it supported his findings), yet discredited most of her other testimony—without any meaningful analysis as to why. The same concerns also apply to the ALJ's reliance on the previously-discussed statements of Ms. Middleton about Plaintiff's ability to mitigate and deal with stressors (statements which, as discussed, were largely taken out of context).

Having found the testimony of Ms. Middleton and Dr. Thurston unpersuasive, essentially

all that remains of the mental health opinions are those of State Agency psychological consultants Dr. Jenson and Dr. Rattan. The ALJ found these opinions persuasive for the same reasons that he found Ms. Middleton's opinion unpersuasive: "[G]enerally normal mental status examination findings other than mood and affect disturbances." *Id.* at 1385. As discussed, however, the ALJ's diminishing of Plaintiff's mood and affect disturbances appears suspect in the context of mental health conditions such as depression, anxiety, and PTSD. In support of his persuasiveness finding, the ALJ also included the identical set of record citations that was used in rejecting Ms. Middleton's opinion. *Id.* at 1385. As noted *supra*, however, these citations simply do not support the propositions for which the ALJ relies on them. The ALJ's cursory evaluation of these opinions is particularly concerning given the specific instructions from the Appeals Council to "[g]ive further consideration to the prior administrative findings of Dr. Rattan and Dr. Jensen . . . ." *Id.* at 1372.

Furthermore, the ALJ's evaluation of the State Agency consultants appears inconsistent with the RFC. For example, both consultants found that Plaintiff had "*moderate* limitations in her ability to . . . interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes." *Id.* at 1385 (emphasis added). The RFC, however, still provided for "*frequent* interactions with people in the workplace, supervisors, coworkers, and the public." *Id.* at 1378 (emphasis added). It is unclear to the undersigned how the ALJ found the consultants' opinions persuasive, which included moderate limitations in various areas of workplace interaction, yet still have allowed for *frequent* interactions of this kind in the workplace. *Compare Herb v. Comm'r of Soc. Sec.*, 366 F. Supp. 3d 441, 446-47 (W.D.N.Y 2019) (finding that an RFC which limited the claimant to occasional interaction with the public and frequent interaction with coworkers and supervisors did not properly account for the claimant's *mild-to-moderate* limitations in this regard) (emphasis added). On remand, the ALJ should explain how the RFC incorporates these specific limitations.

In any ensuing opinion, the ALJ must address the concerns raised in this Order and in Plaintiff's briefing as to the medical opinions and to modify any ensuing ALJ opinion such as to

15

1   clearly reflect the fact that these issues have been considered and addressed.

2   **Third-Party Witness Testimony**

3   "Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account." *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012); *see also* 20 C.F.R. § 404.1529(a) ("We will consider all of your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work."). "[C]ompetent lay witness testimony 'cannot be disregarded without comment,' and . . . in order to discount competent lay witness testimony, the ALJ 'must give reasons that are germane to each witness.'" *Molina*, 674 F.3d at 1114 (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) and *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir.1993)). With that being said, however, an ALJ is not required "to discuss every witness's testimony on a individualized, witness-by-witness basis. Rather, if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Molina*, 674 F.3d at 1114; *see also Valentine v. Comm'r Soc. Sec.*, 574 F.3d 685, 694 (9th Cir. 2009) (holding that because "the ALJ provided clear and convincing reasons for rejecting [the claimant's] own subjective complaints, and because [the lay witness's] testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting [the lay witness's] testimony").

Rebecca Stewart and Linda McSweeney submitted third-party statements on behalf of Plaintiff. The ALJ found these statements unpersuasive for two reasons. First, the ALJ found the statements unpersuasive "because they were not assessed by acceptable medical sources." AR at 1382. The fact that Ms. Stewart and Ms. McSweeney were not acceptable medical sources, however, is irrelevant. An ALJ is *required* to both consider and discuss competent testimony from lay witnesses. *See Molina*, 674 F.3d at 1114; *Nguyen*, 100 F.3d at 1467; *Dodrill*, 12 F.3d at 919. While the revised regulations alter the assessment of testimony from acceptable medical sources

(*see* 20 C.F.R. § 404.1520c),[11] they do not alter the above-mentioned requirements for the assessment of testimony from nonmedical sources. To the extent that the ALJ relied on Ms. Stewart and Ms. McSweeney's status as nonmedical sources as grounds for findings their opinions unpersuasive, this was erroneous. As for the second justification, the ALJ found that "[a]lthough the statements are generally consistent with the claimant's subjective complaints, as discussed above, her subjective complaints are not consistent with the . . . evidence of record." AR at 1382. While an ALJ can reject third-party witness testimony by referring to the reasons given for rejecting the claimant's own testimony, such reasoning must itself be "clear and convincing." *See Valentine*, 574 F.3d at 694. As discussed in detail above, the ALJ's rejection of Plaintiff's own pain and symptom testimony falls well short of this standard. Therefore, the mere reference to such reasoning is also insufficient to properly reject the testimony of the third-party witnesses. On remand, if the ALJ still seeks to reject the testimony of the third-party witnesses, they must either provide reasons that are germane to each witness or refer to the clear and convincing reasons given for the rejection of Plaintiff's own testimony.

## CONCLUSION

Accordingly, for the reasons stated herein, Plaintiff's Motion for Summary Judgment (dkt. 18) is **GRANTED**, Defendant's Cross-Motion (dkt. 19) is **DENIED**, and the case is remanded for further proceedings consistent with the findings and conclusions set forth herein. On remand, the ALJ is **ORDERED** to consider the issues raised in the Plaintiff's briefing and this Order and to modify any ensuing ALJ opinion such as to clearly reflect the fact that these issues have been considered and addressed under the regulations and pursuant to the case authorities set forth herein

---

[11] The Commissioner argues that under the revised regulations the analysis of third-party statements is no longer required. Def.'s Mot. (dkt. 19) at 20-23. The revised regulations, however, merely provide that an ALJ "is not required to articulate how [they] consider[] evidence from nonmedical sources using the requirements in paragraphs (a)-(c) in this section." 20 C.F.R. § 404.1520c(d). In other words, the revised regulations simply reiterate that an ALJ does not need to evaluate third-party lay testimony under the more stringent requirements that apply to medical sources—as was already the case under the old regulations.

**IT IS SO ORDERED.**

Dated: June 1, 2023

_____
ROBERT M. ILLMAN
United States Magistrate Judge

18